FILED

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

2019 MAR 20 PM 2:38

MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

UNITED STATES OF AMERICA and
THE STATE OF FLORIDA
*ex rel.*
CONDRA ALBRIGHT,

Plaintiffs,

v.

REGENCY INC.; MAGIC MEDICAL, INC.; KELLY L. WOLFE; DOES 1-300; and JOHN AND JANE DOES 1-300,

Defendants.

CASE NO.: 8:19-cv-686-T-23AEP

(FILED UNDER SEAL)

## *QUI TAM* COMPLAINT

This is an action brought by Plaintiff/Relator Condra Albright ("Relator") on behalf of the United States of America pursuant to the Federal False Claims Act, 31 U.S.C. §§ 3729-3732 ("FCA") and on behalf of the State of Florida pursuant to the Florida False Claims Act, §§ 68.081-68.9, Fla. Stat. ("Florida FCA"). In support thereof, Relator alleges as follows:

1. From at least 2016 and continuing through the present, Defendants Regency, Inc. ("Regency"), Magic Medical, Inc. ("Magic Medical"), Kelly L. Wolfe ("Wolfe"), Does 1-300, and John and Jane Does 1-300 (collectively "Defendants"), nationwide suppliers of durable medical equipment ("DME"), have engaged in actions designed to defraud the United States by knowingly submitting and/or causing to be submitted false and/or fraudulent claims for payment to the Medicare, Medicaid, and CHAMPUS/TRICARE programs ("Government Payors"). Specifically, Defendants have knowingly and intentionally (1) falsified documentation in order to

$400
TPA055788

fraudulently establish DME corporations with the sole purpose of billing Government Payors for medically unnecessary DME equipment; (2) engaged in improper marketing practices which violate the Anti-Kickback Statute; and (3) engaged in improper practices involving telehealth physicians.

2. The FCA provides that any person who knowingly submits or causes to be submitted to the Government a false or fraudulent claim for payment or approval is liable for a civil penalty of between $10,781 and $21,562 for each such claim, and three times the amount of damages sustained by the government. The FCA permits persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery.

3. Pursuant to the FCA, Relator seeks to recover on behalf of the United States damages and civil penalties arising from Defendants' intentional submission of false and fraudulent claims to Government Payors.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. §§ 1331, 1345 and 1367.

5. This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, because Defendants can be found in, reside in, transact business in, and/or have committed the alleged acts in the Middle District of Florida.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because Defendants can be found in, reside in, or have transacted business in the Middle District of Florida.

7. Relator is an original source as defined by the FCA in § 3730(e)(4)(B) because all of the allegations in this Complaint are based on evidence directly acquired by Relator independently and through her own efforts. None of the allegations set forth in this Complaint are based on public disclosure of information in a criminal, civil, or administrative hearing in a Congressional, administrative, or General Accounting Office report, hearing, audit or investigation, or from news media.

8. Relator made a voluntary disclosure to the United States prior to the filing of this lawsuit, as required by 31 U.S.C. § 3730(b)(2).

## PARTIES

9. The United States and the State of Florida are the real parties in interest to this lawsuit.

10. Relator Condra Albright is a United States citizen currently residing in Tennessee. She was hired by Defendant Regency as an administrative assistant in May 2018. In July 2018, Relator was promoted to operations manager for all of Defendant Regency's DME locations in Chattanooga, Tennessee. As operations manager, Relator was in regular contact with Defendant Wolfe, and several of Wolfe's key employees. Part of Relator's responsibilities included hiring and supervising administrative assistants in Chattanooga, finding locations for Defendants' new DME Suppliers, and negotiating leases, which were signed by Defendant Regency's personnel. Relator was also responsible for furnishing Defendants' DME Suppliers, assisting with preparation for Board of Certification accreditation (described in more detail herein), and performing beneficiary eligibility verification at the direction of Defendant Regency's employees.

11. Defendant Kelly L. Wolfe is an individual residing in or near Pinellas County, Florida. Wolfe owns or has owned all of the corporate defendants described herein.

12. Defendant Regency, Inc. is a for-profit corporation organized and existing under the laws of the State of Florida. Defendant Regency's principal office is located at 1301 Seminole Blvd., Suite 112 in Largo, Florida. Defendant Wolfe is the owner of Defendant Regency.

13. Defendant Magic Medical, Inc. is based in Largo, Florida. Defendant Magic Medical is owned by Defendant Wolfe. Although Defendant Magic Medical purports to be a supplier of DME equipment, it is a shell corporation offering no actual services or products.

14. Defendant Does 1-300 are corporate suppliers of DME equipment ("DME Suppliers") formed directly or indirectly by Defendant Wolfe for purposes of perpetrating the fraud described herein. Exhibit A to this Complaint is a detailed list of DME Suppliers formed by Defendant Wolfe as of the date of the filing of this Complaint. Exhibit B identifies DME Suppliers that have been sold to investors (as detailed further herein). The fraud described herein is ongoing, and therefore the list of DME Suppliers continues to grow. They are located primarily in Florida, including the Middle District of Florida, and in Tennessee.

15. Defendants John and Jane Does 1-300 are the individual investors acquiring all or a part of one or more of the DME Suppliers described above for the purpose of participating in the fraud described herein.

## <u>REGULATORY OVERVIEW</u>

### The Federal and Florida False Claims Acts

16. The FCA provides, in relevant part:

[A]ny person who--

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
(C) conspires to commit a violation of subparagraphs (A) or (B); and/or
(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-4101), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C.A. § 3729(a)(1).

17. The Florida FCA largely tracks the FCA and provides in relevant part:

Any person who:

(a) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;
(b) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;
(c) Conspires to commit a violation of subparagraphs (a) or (b); and/or
(g) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state

is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the state sustains because of the act of that person.

§ 68.082, Fla. Stat. Ann.

18. Both the FCA and the Florida FCA permit individuals to bring a civil action in the name of the Government for violations of the respective statutes. 31 U.S.C. § 3730(b)(1); § 68.083(2), Fla. Stat.

19. Both the FCA and Florida FCA define "knowing" and "knowingly" to mean a person who, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1); §68.082(1)(c), Fla. Stat. Ann. No proof of specific intent to defraud is required and an innocent mistake is not a defense to an action under these acts. *Id.*

**The Anti-Kickback Statute**

20. The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the program from these difficult-to-detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

21. The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs.

22. Any claim filed in violation of the Anti-Kickback Statute is a false claim. 42 U.S.C. § 1320a-7a(a)(7).

23. The purchasing and selling of patient or beneficiary lists implicates the Anti-Kickback Statute, which prohibits the exchange of anything of value to induce the referral of federal healthcare program business. Purchasing patient or beneficiary lists that contain healthcare and specific patient information is prohibited under the Anti-Kickback Statute. 42 U.S.C. § 1320a-7b(b)(4).

**GOVERNMENT HEALTHCARE PROGRAMS**

24. The Medicare program ("Medicare") is a health insurance program administered by the United States. It is funded by taxpayer revenue. Medicare is directed by the United States Health and Human Services Department ("HHS"). Medicare was designed to assist participating states in providing medical services and DME to persons over sixty-five (65) years of age and certain others who qualify.

25. The Medicaid program ("Medicaid") is a health insurance program funded by state and federal taxpayer revenue. It is overseen by HHS. Medicaid was designed to assist participating states in providing medical services, DME, and prescription drugs to qualifying financially-needy individuals.

26. CHAMPUS/TRICARE is a federally-funded program that provides medical benefits to (a) the spouses and unmarried children of (1) active duty and retired service members and (2) reservists who were ordered to active duty for thirty (30) days or longer; (b) the unmarried spouses and children of deceased service members; and (c) retirees.

**ALLEGATIONS**

**Defendants Engaged in a Widespread Scheme to Defraud Government Payors**

**Fraudulent Establishment of DME Suppliers**

27. The Defendants in this action are collaborators and co-conspirators in a multi-state scheme using fraudulently-established DME Suppliers solely for the purpose of defrauding Government Payors out of millions—and perhaps hundreds of millions—of dollars annually.

28. Beginning in or around 2016, Defendant Wolfe individually, and through Defendant Regency, has created more than 100 DME Suppliers throughout Florida and Tennessee, and possibly in other states as well.

29. Defendant Wolfe causes each of her DME Suppliers to become incorporated and then designates them with a physical office location. A number of the DME Suppliers are located in various offices within the same office building and list the same physical address.

30. Defendant Wolfe obtains federal Tax ID numbers and NPI numbers for each DME Supplier, and then provides each location with sparse furnishings. Defendant Wolfe designates one office manager (often Defendant Wolfe herself) and/or an administrative assistant paid at or close to minimum wage. The administrative assistants generally have no qualifications and simply follow Defendant Wolfe's orders.

31. The DME Suppliers do not stock any inventory, although they typically have a single DME product sample on hand (such as a back or knee brace) to show to CMS should one of its officers drop by unannounced.

32. Once the DME is formed, Defendant Wolfe directs an operations manager, such as Relator, to obtain facility accreditation and approval, which is done via an application and site inspection process run through the Board of Certification/Approval ("BOC"). (See www.bocusa.org (stating, in relevant part: "The Centers for Medicare and Medicaid Services

(CMS) recognizes BOC as one of ten deemed accrediting organizations for DMEPOS suppliers, and facilities can earn accreditation for all CMS billing categories")).

33. BOC certification of a DME Supplier is a precondition to obtaining a Provider Transaction Access Number ("PTAN"), which, in turn, is needed in order for the DME Supplier to submit claims to and receive reimbursement from Government Payors.

34. The BOC Site Survey Checklist sets forth a number of documents and information that must be provided for review by a BOC inspector at each DME Supplier for which a PTAN is being sought.

35. Defendants do not meet the requirements on the BOC checklist. Most, if not all, of the documents are completely fabricated.

36. From its headquarters in Florida, Defendant Regency provides each DME Supplier with records which are internally designated as "File #1." File #1 contains records that must be kept on location at each DME Supplier's site. File #1 is customized for each DME Supplier to create the appearance that the records were uniquely created for each location.

37. Defendant Regency populates File #1 for each DME Supplier's location for which a BOC accreditation certificate is being sought, and includes the following documents: (1) corporate structure, which lists the name of the entity's president and/or compliance officer and administrative assistant; (2) search results pages showing that neither Defendant Regency nor Defendant Magic Medical are entities excluded by HHS; (3) Certificates of Liability Insurance; (4) a purported policy for Detecting and Reporting Counterfeit Products; (5) a purported Service Description/Marketing Guideline document; (6) a purported Magic Medical, Inc. Account Contract for Inventory; (7) a purported Business Associate Agreement, supposedly setting forth contract services between the DME Supplier and Defendant Regency for purposes of verifying

the eligibility of Medicare beneficiaries; and (8) a purported agreement between the DME Supplier and Defendant Regency to facilitate billing Government Payors for products supplied by the DME, in exchange for a fee of 5% of the amount received. All of these documents are fabricated.

38. Each File #1 package is essentially identical, but for the name and address of the DME Supplier and the names of fictitious patients who allegedly paid cash for DME (described in more detail below).

39. Each File #1 package was, or will be, presented to BOC inspectors for the purpose of inducing BOC to approve the DME Suppliers' applications and to grant their accreditations—all of this is done so the DME Suppliers can receive their PTANs and begin fraudulently billing Government Payors.

40. Included within File #1 are records that purport to be patient records for five actual patients. Those five patient records are required for BOC certification.

41. Specifically, the BOC Site Survey Checklist requires that each DME Supplier have, on-site, "5 patient files to include pertinent documentation, in accordance with CMS guidelines and state/local requirements (e.g. prescription, physician' notes, Certificate of Medical Necessity (CMN)), face-to-face evaluations, physical/home assessment, communication with the patient, delivery ticket, Advanced Beneficiary Notice (ABN), follow-up services, warranty rental and return policies, etc.)."[1]

42. In order to fake compliance, Defendant Regency sends false and fraudulent documentation to the operations manager (or other DME Supplier employee responsible for assembling documentation). The fraudulent records are prepared at the direction of Defendant Wolfe. For each such fictitious patient file, the alleged patient is either a deceased person, or the

[1] https://www.bocusa.org/files/Survey_Check_List52018.pdf

patient name is entirely fabricated. Each patient record purports to show a "cash sale" for a Comfortland Medical-brand off-the-shelf orthotic brace.

43. One of the numerous examples of this scheme involves Opal Fox, Inc., which is a DME Supplier created and owned by Defendant Wolfe. Exhibit C to this Complaint is the File #1 for Opal Fox, and it contains fictitious contracts (with Defendant Wolfe's other companies), insurance papers, and other fake documents. Exhibits D-H are the "patient records" of the five alleged cash-paying patients for Opal Fox, none of whom actually exist.

44. Another example of Defendants' fraudulent scheme involves Range of Motion Medical, Inc., which was created by Defendant Wolfe for the sole purpose of defrauding Government Payors. Exhibits I-M are the "patient records" for the five alleged cash-paying patients for Range of Motion Medical, Inc., none of whom actually exist.

45. Relator received Exhibits I-M from Defendant Regency while she was working as an operations manager in Tennessee. The patient records allegedly identified patients living in Tennessee. When Relator received the records, they were unsigned. Upon realizing this mistake, Defendant Regency re-sent the records from Florida to Tennessee—and the records had all been corrected to reflect signatures from patients purportedly living in Tennessee. The signatures had obviously been forged.

46. Another illustration of Defendants' fraud involves Titan Medical Supply, Inc., another entity created by Defendant Wolfe for the sole purpose of defrauding Government Payors. Exhibits N-R reflect the fictitious files for five cash-paying patients for Titan Medical Supply, Inc., none of whom actually exist.

47. For at least the past two years, and possibly longer, Defendants have repeated their fraudulent scheme over and over again, literally many dozens of times. All of Defendants'

fraudulent DME Suppliers improperly received BOC approval and have billed—and in some cases continue to bill—Government Payors.

48. Defendants intend their false documentation be relied upon to attain BOC approval, which then allows Defendants to submit claims for payment to Government Payors.

49. To date, Defendant Wolfe has established more than 100 DME Suppliers in Florida and eastern Tennessee. While many of the DME Suppliers have been incorporated in the name of Defendant Wolfe, others were formed or now exist under the names of her inner circle of employees. Those persons include: Franz Hilberbath, Schuyler St. John (a/k/a Schuyler S. Poppe), and Michelle Koehlinger.

50. Once Defendant Wolfe's fake DME Suppliers pass BOC approval and can begin billing Government Payors, she sells them, in whole or in part, to different investors for a fee of approximately $65,000 plus ongoing royalties.

51. Of the approximately 85 DME Suppliers started by Defendant Wolfe (or her associates) in Florida since 2017, 31 have been sold to investors. Similarly, of the approximately 13 DME Suppliers started by Defendant Wolfe (or her associates) in Tennessee since 2017, four have been sold to investors.

52. Exhibit B reflects, to the best of Relator's knowledge, the sold DME Suppliers entities and their investors. The investors know, or should have known, of the fraudulent scheme and are active participants in it.

**Improper Use of Lead Generation Companies**

53. In order to get business for the fraudulently-established DME Suppliers, Defendants pay compensation to Lead Generation Companies ("LGCs") for the names and identifying information of Government healthcare beneficiaries who are potential candidates for

orthotics (i.e., back, knee, ankle and shoulder braces). These beneficiaries are referred to as "leads."

54. Defendants pay at least seven LGCs for leads. Relator knows four of them by name:

- R&L Senior Marketing LLC (201 3rd Ave. N., Amory, MS 38821)
- Pinellas Health Corp. (4707 Pinellas Dr., Orlando, FL 32812)
- National Healthcare Advocates LLC (4707 Pinellas Dr., Orlando, FL 32812)
- M.D.C. Unlimited Corp. (1967 Longwood Lake Mary Rd., Suite 1007, Longwood, FL 32750)

55. Under the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and Telephone Solicitation Statute, 47 C.F.R. 64.1200(12), LGC's are required to obtain leads via opt-in only and to provide their customers with lists of opt-ins regardless of the patient's insurance. These rules are in place to ensure beneficiaries clearly understand to what they are agreeing. The LGC's used by Defendants do not comply with these rules. Instead, while the LGCs do obtain some patient names via opt-in, many come from web-crawlers, data mining, misleading advertising and cold calls.

56. The LGCs provide new leads to Defendant Regency on a near-daily basis, and the leads are presented in the form of Google Live spreadsheets. Hundreds of leads are added to the spreadsheets each week, if not each and every work day..

**Telehealth Fraud**

57. Each business morning, Franz Hilberbath (a/k/a "LJ"), one of Defendant Wolfe's "inner circle employees" at Defendant Regency, sends out instructions to each of the DME Suppliers' administrative assistants and operations managers via the GroupMe chat application.

The instructions tell the employees which pages of the Google spreadsheets they are responsible for mining.

58. Defendants' administrative assistants and operations managers spend several hours each workday either checking Medicare databases for leads or calling insurance companies that operate Medicare Advantage plans to inquire about leads; the inquiries generally follow the same script—Defendants' employees attempt to determine whether the lead (the beneficiary) has received an orthotic brace within the last five years, and, if so, when and which brace(s), and, finally, whether the beneficiary is eligible to receive any additional orthotic braces reimbursable by any Government Payor.

59. In the event they get information on a lead, Defendants' employees update the beneficiary's record within the Google Live spreadsheet, which automatically captures the new information; "P," indicating "Pass," is entered for each orthotic brace for which the beneficiary is still eligible for reimbursement by a Government Payor.

60. The purpose of the above-described action is to enable Defendants to order, ship, and bill Government Payors for every single DME device that beneficiaries do not already possess, as described in more detail below.

61. Once the beneficiaries have been identified with a "P" on Defendants' spreadsheets, Defendant Regency or Defendant Wolfe (or her affiliates) arrange for a telehealth physician to contact those beneficiaries. The purpose of the contact is to "prescribe" a DME orthotic.

62. Payments to the telehealth companies are made either by Defendant Regency/Defendant Wolfe, by the LGCs, or both. Telehealth companies operating within these schemes typically hire physicians who perform telehealth "consultations" as moonlighters.

Telehealth physicians also often include doctors who have lost their practicing privileges, or who have lost their Drug Enforcement Agency ("DEA") registration to prescribe controlled substances.

63. Telehealth physicians performing this kind of work are generally paid a small sum of money, such as $15 to $30, to hold a short telephone "consult," which may last as little as five minutes. The telehealth physicians then write prescriptions for the beneficiaries for orthotics. The physicians direct that the prescriptions be filled by a DME Supplier owned or controlled by Defendant Wolfe and/or her affiliates (or founded by her, in the case the DME Supplier has been sold to an investor).

64. Government Payors reimburse for DME prescribed during a telehealth situation only under certain circumstances. Conditions for reimbursement include requirements that (i) the beneficiary must travel to an "originating site" (e.g., hospital or physician's office) at which the telehealth consultation will occur; (ii) the originating site must be located in a health professional shortage area or in a rural area; and (iii) the telehealth encounter must include both video and audio. *See* 42 C.F.R. § 410.78, 42 U.S.C. § 1395w-4; *see also* CMS Medicare Claims Processing Manual (Pub. 100-02), Chapter 1, Section 70.8.8.

65. Defendants' telehealth providers do not adhere to any of the regulations above. Because of this, neither Defendants – nor the telehealth companies, nor the telehealth physicians themselves – submit claims to Government Payors for the telehealth physicians' professional services—despite the fact that regulations require a claim be submitted for all covered services rendered to Medicare patients—in order to avoid having their fraudulent scheme exposed.

## Medical Non-Necessity

66. Defendants direct the telehealth doctors to prescribe patients every possible DME, regardless of medical need.

67. In many cases, patients have received up to seven different orthotics, regardless of need.

68. The screenshot below reflects a patient who was prescribed every single available orthotic that had not already been prescribed by another physician:



| HCPCS/Modifier | Date Of Service | Number of Units | Name of Supplier | Phone Number |
|---|---|---|---|---|
| [illegible] | [illegible] | 1 | ADVANCED MEDICAL SUPPLY LLC | [illegible] |
| [illegible] | [illegible] | 1 | ADVANCED MEDICAL SUPPLY LLC | [illegible] |
| [illegible] | [illegible] | 2 | ADVANCED MEDICAL SUPPLY LLC | [illegible] |
| [illegible] | [illegible] | 2 | ADVANCED MEDICAL SUPPLY LLC | [illegible] |
| [illegible] | [illegible] | 1 | ADVANCED MEDICAL SUPPLY LLC | [illegible] |
| [illegible] | [illegible] | 1 | ADVANCED MEDICAL SUPPLY LLC | [illegible] |
| [illegible] | [illegible] | 1 | ADVANCED MEDICAL SUPPLY LLC | [illegible] |
| [illegible] | [illegible] | 1 | ADVANCED MEDICAL SUPPLY LLC | [illegible] |
| [illegible] | [illegible] | 1 | ADVANCED MEDICAL SUPPLY LLC | [illegible] |
| [illegible] | [illegible] | 1 | ADVANCED MEDICAL SUPPLY LLC | [illegible] |

69. Exhibits S-U contain redacted medical records of three patients. They provide examples of the above-described fraud at Perfect Motion Medical, another of Defendant Wolfe's DME Supplier companies. Each of the patients received: (1) one neck brace; (2) two knee braces; and (3) one shoulder brace, all without necessity, all prescribed by providers residing in different states, but who held licenses in the state where the patients were residing.

70. The above are merely a few examples to illustrate the fraud Defendants have perpetrated—and continue to perpetrate—resulting in thousands upon thousands of unnecessary DME being ordered for patients in states all over the country. Defendants intend that all of the fraudulently ordered DME be paid for by the Government Payors.

71. Although the full scope of Defendants' fraud is known only to Relator and other insiders who work with or for the Defendants, many patients have blogged about Defendant Wolfe's DME Suppliers sending them products they do not need or want:

> FRAUD WARNING! This company targets Medicare recipients and tells them that they are Medicare calling to "check in on your back pain". My mother in law received a call and thought it was Medicare calling to check in on her. She does have some back and leg pain so it didn't seem out of the ordinary for someone to be checking in. They got her information and sent her a box of various leg and back braces. We recently received a bill showing that they charged $1000+ for each brace, bringing our out of pocket expense to $750! I tried to call the company at the number provided and the mailbox is full. This is a total scam and luckily Medicare was able to open a fraud claim against First Stop Medical Supply. There is a spot in hell reserved for people who take advantage of elderly people.
>
> They sent me a box with a bunch of braces. I do not remember a call from them. I put the box on the shelf in the garage and did not realize what was happening until my supplemental insurance sent monthly notice saying they had paid after medicare paid. Total Fraud. I finally go ahold of the company and they said if I sent the braces back, they would reimburse medicare. Did not happen. I reported to Medicare but it does not seem like they pursue this. This company should be shut down.

**Fraudulent Billing**

72. Defendants' DME Suppliers purportedly have a "supplier contract" with Defendant Magic Medical. In fact, the actual DME products (such as braces and other orthotics provided to beneficiaries) are drop-shipped by Comfortland Medical, Inc. of Mebane, North Carolina. The DME Suppliers then bill Government Payors for those products.

73. An example of this practice involves Star Medical, owned by Defendant Wolfe. In October 2018, Star Medical billed—and in fact was reimbursed -- $153,248.90 for unnecessary DME in just one single week. Exhibit W contains the checks received by Star Medical during that one week period.

74. Defendant Wolfe is replicating the same scheme described above at all of her DME Suppliers. Total damages to the United States due to Defendants' fraudulent actions could potentially exceed $1 billion.

## COUNT I

## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

75. Relators incorporate paragraphs 1-74 of this Complaint, as though fully set forth herein. This count sets forth claims for treble damages and civil penalties under the FCA.

76. As described in greater detail above, Defendants abused Government healthcare programs in connection with the falsification of documentation in order to establish DME Suppliers, by fraudulently inducing the Government's contractor, BOC, to grant accreditation credentials for the sole purpose of facilitating fraudulent billing to Government Payors for medically unnecessary DME equipment, as well as engaging in fraudulent marketing practices and improper practices involving telehealth physicians.

77. Under the FCA, Defendants have violated:

i. 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

ii. 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim;

iii. 31 U.S.C. § 3729(a)(1)(C) by conspiring to commit a violation of 31 U.S.C. § 3729(a)(1)(A) and/or (a)(1)(B); and

iv. 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government.

78. Because of the false claims made by Defendants, the United States has suffered and continues to suffer damages, and is therefore entitled to a recovery as provided by the FCA of an amount to be determined at trial, plus a civil penalty for each violation.

## COUNT II

## VIOLATIONS OF THE FLORIDA FALSE CLAIMS ACT

79. Relators incorporate paragraphs 1-74 of this Complaint as though fully set forth herein. This count sets forth claims for treble damages and forfeitures under the Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*

80. As described in greater detail above, Defendants abused Government healthcare programs, including the Florida Medicaid program, in connection with the falsification of documentation in order to establish DME Suppliers for the sole purpose of fraudulently billing Government Payors for medically unnecessary DME products, as well as engaging in fraudulent marketing practices and improper practices involving telehealth physicians.

81. Under the Florida FCA, Defendants have violated:

v. Fla. Stat. § 68.082(2)(a) by knowingly presenting or causing to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval;

vi. Fla. Stat. § 68.082(2)(b) by knowingly making, using, or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency;

vii. Fla. Stat. § 68.082(2)(c) by conspiring to commit a violation of Fla. Stat. § 68.082(2)(a) and/or 68.082(2)(b); and

viii. Fla. Stat. § 68.082(2)(g) by knowingly making, using, or causing to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the state.

82. Because of the false claims made by Defendants, the State of Florida has suffered and continues to suffer damages, and is therefore entitled to a recovery as provided by the Florida FCA of an amount to be determined at trial, plus a civil penalty for each violation.

## COUNT III

## VIOLATIONS OF THE ANTI-KICKBACK STATUTE

83. Relators incorporate paragraphs 1-26 and 53-56 of this Complaint as though fully set forth herein.

84. The Anti-Kickback Statute prohibits offering, paying, soliciting, or receiving anything of value to induce rewards, referrals or general federal healthcare business. 42 U.S.C. § 1320a-7b(b).

85. As described in the Complaint, Defendants knowingly and intentionally paid vendors, including R&L Senior Marketing, Pinellas Health Corp., National Healthcare Advocates, LLC and M.D.C. Unlimited Corp. financial compensation in exchange for improper beneficiary leads.

86. Defendants' actions caused Government Payors to reimburse them for items stemming from claims that resulted from prohibited activities under the Anti-Kickback Statute.

## PRAYER

WHEREFORE, Relator, on behalf of the United States and the State of Florida, respectfully requests that:

a. This Court enter an order determining that Defendants violated the FCA and the Florida FCA by making false statements and records to cause false claims to be submitted to the United States and the State of Florida;

b. This Court enter an order requiring Defendants to pay treble damages and the maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States and for each false or fraudulent claim presented to the State of Florida;

c. This Court enter an order requiring that Defendants cease and desist from violating the FCA and the Florida FCA;

d. This Court enter an order requiring Defendants to pay all expenses and attorney's fees and costs associated with this action;

e. This Court enter an order paying Relator the maximum statutory award for her contributions to the prosecution of this action; and

f. Any and all other relief the Court determines to be reasonable and just.

**PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS.**

Dated: March 20, 2019

Respectfully submitted,

Jesse L. Hoyer
Florida Bar No.: 076934
jesse@jameshoyer.com
Sean Estes

Florida Bar No.: 055770
sean@jameshoyer.com
James Hoyer, P.A.
2801 W. Busch Blvd., Suite 200
Tampa, FL 33618
Tel.: 813-375-3700
Fax: 813-375-3710

Charles Rabon*
North Carolina Bar No.: 16800
cranbon@usfraudattorneys.com
Rabon Law Firm, PLLC
225 E. Worthington Ave., Suite 100
Charlotte, NC 28203
Tel.: 704-247-3247
Fax: 704-208-4645
*to be admitted pro hac vice

**Counsel for Relators**